THIS OPINION IS
A PRECEDENT OF
THE TTAB

Oral Hearing: August 3, 2010       Mailed: January 28, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Jonathan Drew, Inc. d/b/a Drew Estate
_____

Serial No. 77099522
_____

Philip J. Foret of Dilworth Paxson LLP for Jonathan Drew, Inc. d/b/a Drew Estate.

David C. Reihner, Trademark Examining Attorney, Law Office 111 (Craig D. Taylor, Managing Attorney).
_____

Before Holtzman, Walsh and Bergsman, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:

Jonathan Drew, Inc. (applicant) has filed an application to register the standard character mark KUBA KUBA for goods identified, as amended, as "cigars, tobacco and related products, namely, cigarettes, cigar boxes, lighters, holders, ashtrays, cigar bands, cigar cutters, humidors, and cigar tubes" in Class 34.[1]

_____

[1] Serial No. 77099522, filed February 5, 2007, based on an allegation of a bona fide intention to use the mark in commerce.

Serial No. 77099522

The trademark examining attorney ultimately refused registration on the ground that the mark is primarily geographically deceptively misdescriptive of the goods under Section 2(e)(3) of the Trademark Act.

When the refusal was made final, applicant appealed. The appeal has been briefed, and an oral hearing was held.

A mark is primarily geographically deceptively misdescriptive of the goods if (1) the mark's primary significance is a generally known geographic location; (2) the relevant public would be likely to believe that the goods originate in the place named in the mark (i.e., that a goods/place association exists) when in fact the goods do not come from that place; and (3) the misrepresentation is a material factor in the consumer's decision. See In re California Innovations Inc., 329 F.3d 1334, 66 USPQ2d 1853, 1858 (Fed. Cir. 2003).

The examining attorney argues that the mark KUBA KUBA is a mere misspelling of Cuba, the name of a generally known geographic location. Of record is an excerpt from *The Columbia Gazetteer of the World Online* (2005),[2] which establishes that Cuba is a large island country located in the Caribbean Sea with a population of over 11 million people. The *Gazetteer* entry also states that cigars are one of five "important" exports from Cuba

_____

[2] From the website columbiagazetteer.org.

2

and that such cigars contain "[h]igh-quality tobacco."  In addition, the examining attorney submitted printouts from various third-party websites which show that Cuba is known for, and is famous for, its production of tobacco and cigars.  Excerpts from several of these websites are listed below.

> Alumna's photos show how Cuba's world-renowned cigars are crafted:
> It is almost impossible to get hold of a box of world-renowned Cuban cigars in the United States, and few American travelers visit Cuba.  But Cornell alumna Helen Kleinberg '48 is one who has been to Cuba and back, and she has captured the making of the much coveted Cuban cigar....
> news.cornell.edu
>
> Cuban Life & Boxes [Exhibit]:
> Cuba is rightly renowned for its cigar tobacco.  Most famous is that from the Vuelta Abajo in the Pinar del Rio region of Western Cuba.  ...  Vuelta Abajo tobacco is the standard against which all other cigar tobaccos are measured.
> nationalcigarmuseum.com
>
> Cigar Tobacco Growing Regions:
> Cuban tobacco is acknowledged as among the finest in the world.  ...  In general, Cuban tobacco is strong and full-bodied, with spicy and aromatic flavors.  It is also renowned for its suppleness.
> jrcigars.com
>
> How to Spot Fake Cuban Cigars:
> Everyone knows that Cuban cigars are the most coveted cigars, renown [sic] worldwide for their smoothness and rich flavors.  Indeed, Cuban cigars are so prized that many illegitimate dealers have been known to sell fake Cubans to unsuspecting cigar smokers.
> smokers-express.net
>
> Traditions:  South Florida Folklife:
> Handrolled Cuban cigars are world renowned for their excellence.  With the U.S. embargo on Cuban products, many small cigar-rolling businesses opened in Miami.

> Most of those who own or work in these operations
> learned the trade in Cuba, and some come from
> families that have made cigars for generations.
> hmsf.org (Historical Museum of Southern Florida)

Applicant does not dispute that the primary meaning of Cuba is geographic, or that Cuba is famous for its tobacco products and cigars. Applicant, however, argues that the examining attorney has not established prima facie that KUBA KUBA is a mere misspelling of Cuba and that, in any event, the mark is not a mere misspelling of Cuba. It is applicant's contention that the mark has other geographic as well as non-geographic meanings such that it would not be perceived as a reference to Cuba.

## Primary Significance of KUBA KUBA

A mark that is a mere misspelling or variant of a name for a geographic location is considered the equivalent of the official name for purposes of determining the primary meaning of the mark. See, for example, Stabilisierungsfonds fur Wein v. Peter Meyer Winery GmbH, 9 USPQ2d 1073, 1076 (TTAB 1988) (GOLDENER TROPFEN, a misspelling of Goldtropfchen, deceptive for wine not from that region in West Germany); Bureau National Interprofessionnel Du Cognac v. International Better Drinks Corp., 6 USPQ2d 1610, 1615 (TTAB 1988) (COLAGNAC, a misspelling of Cognac, deceptive for brandy not made from wines produced from grapes grown in the Cognac region of France).

The question is whether the mark KUBA KUBA would be perceived as a mere misspelling of the generally known geographic place, Cuba, or whether it would have some other significance to the relevant public.  To make this determination, we consider whether KUBA KUBA is sufficiently similar to Cuba in terms of appearance, sound and meaning such that it would be perceived as the equivalent of Cuba.  Cf. In re Bayer Aktiengesellschaft, 488 F.3d 960, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007) ("In determining whether ASPIRINA is sufficiently similar to aspirin [the generic term for analgesics] to render it merely descriptive of analgesic goods, the relevant features of the mark are considered including appearance, sound, and meaning.").

KUBA and Cuba are similar in appearance.  Applicant has simply used a "K" in place of the "C" as the initial letter. The two terms are at least similar in pronunciation, and they might reasonably be pronounced the same.  Both Cuba and KUBA begin with the sound of the letter "k."  The examining attorney notes that "Cuba" is pronounced as "kyóobĕ" as shown in the *Encarta World English Dictionary* (2009).[3]  The "ku" syllable in KUBA may be pronounced with a double "o" sound as in "tube," or it may be pronounced with a long "u" sound as in "Cuba," in which case the two terms would sound the same.  We note, for example,

---

[3] From the website encarta.msn.com.

that the "ku" syllable in the dictionary word "kudos" may be pronounced either way, as "kyo͞o'däs'" or "ko͞o'-; -dōs'." *Webster's New World College Dictionary* (2010).[4]

There is nothing fanciful or unusual about the spelling of Cuba as KUBA. Indeed, a number of cases have found that a misspelling formed by substituting the letter "k" for a "c" is not sufficient to turn the otherwise unregistrable term into a registrable mark. See, for example, King-Kup Candies, Inc. v. King Candy Co., 288 F.2d 944, 129 USPQ 272, 273 (CCPA 1961) ("...'Kup,' which is the full equivalent of the word 'cup,' is descriptive"); American Druggist Syndicate v. United States Industrial Alcohol Co., 2 F.2d 942, 943 (D.C. Cir. 1924) ("'Al-Kol' is merely a phonetic or misspelling of the word 'alcohol,' and is descriptive of the goods"); In re Organik Technologies Inc., 41 USPQ2d 1690, 1694 (TTAB 1997) ("ORGANIK, which is the phonetic equivalent of the term 'organic,' is deceptive.").

As to meaning, applicant argues that the term KUBA alone, and the mark KUBA KUBA as a whole, would convey meanings and associations that are different from the country of Cuba. In particular, applicant argues that consumers would associate KUBA

---

[4] Retrieved from the website yourdictionary.com. The Board may take judicial notice of dictionaries, including online dictionaries which exist in printed format. See In re CyberFinancial.Net Inc., 65 USPQ2d 1789, 1791 n.3 (TTAB 2002). See also University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

with the Kuba Kingdom, and that the mark would be primarily viewed as a non-geographic term with a meaning "associated with the overall look and feel of the art and culture of the African Kuba Kingdom."  Brief, p. 9.

According to the Wikipedia entry submitted by applicant (wikipedia.org), the Kuba Kingdom was a pre-colonial Central African state which existed from the 16th century until about the 19th century in what is now the Democratic Republic of the Congo. A printout from the website sujaro.com states that the Kuba Kingdom eventually split into a number of separate chiefdoms with an existing population of about 250,000.  Based on information appearing on other websites submitted by applicant, the Kuba people are known for their embroidered textiles and elaborate ceremonial costumes and regalia; and for finely crafted masks, spears and knives.  See, e.g., smithsonianeducation.org; forafricanart.com; authenticafrica.com.  The evidence shows that some of these products, such as masks and knives, are offered for sale to the public on various websites, for example, sephari.com; collectplaza.com; theebonytree.com; and sujaro.com.

Applicant also argues that the mark has other geographic as well as non-geographic meanings.  Applicant states that Kuba "identifies numerous locations throughout the world," including

Uzbekistan;[5] Panama;[6] Azerbaijan;[7] and Japan;[8] that it is also a Polish given name in Poland;[9] and an acronym for the Korea University Buddy Assistance (KUBA) program.[10]  In addition, applicant submitted a Google search summary showing multiple listings for a restaurant called "Kuba Kuba" located in Richmond, Virginia.

In evaluating the likely meaning of KUBA KUBA we must consider the mark in relation to the goods with which the mark is (or will be) used and from the perspective of the relevant purchasers.  See In re MCO Properties Inc., 38 USPQ2d 1154 (TTAB 1995); and In re Jim Crockett Promotions Inc., 5 USPQ2d 1455, 1456 (TTAB 1987) ("a mark must be considered in the context of its use and the meaning it would have for the relevant public when so used.").  The goods in this case include tobacco and cigars which are ordinary consumer items purchased by the general public.

Unless the alternative geographic or non-geographic meanings of a geographical term are generally known to the relevant public, such meanings can be of no importance in determining the

---

[5] maplandia.com ("Google Maps World Gazetteer").
[6] fallingrain.com ("Maps, Weather and Airports").
[7] jewishvirtuallibrary.org (an article entitled "The Virtual Jewish History Tour:  Azerbaijan" by Joanna Sloame.
[8] fallingrain.com, supra.
[9] behindthename.com ("the etymology and history of first names"). babylon.com ("translation and dictionary tool").
[10] Document entitled "Global KU Frontier Spirit" (promoting a "study abroad" program).

perception of the relevant public.  There is no evidence that the "alternative" meanings cited by applicant would be anything but obscure to most consumers.  Nor can we find based on the evidence that more than a small segment of the public would be familiar with the Kuba Kingdom or its culture.  As applicant acknowledges, the Kuba Kingdom is known in "certain circles" for its art. Resp. November 29, 2007.  Moreover, even if consumers were generally familiar with the Kuba Kingdom, this meaning would not detract from the significance of KUBA KUBA as a reference to Cuba.  Applicant's goods are cigars, not tribal artifacts for which the Kuba Kingdom is known.  When KUBA KUBA is viewed in connection with cigars, for which Cuba is famous, the most likely meaning of the term would be Cuba.

In fact, certain evidence relied on by applicant to show non-Cuban meanings of KUBA and KUBA KUBA would actually support a finding that the mark means Cuba.  The "Kuba Kuba" restaurant listed in applicant's Google search summary is described as "Richmond's best option for Cuban food" (kubakuba.info); and as "Tasty Cuban fare in lively bodega..." (gayot.com).  The Babylon website listing the various meanings of "Kuba," also refers to "Kuba" as "an alternative spelling (or name) for Cuba."

Because KUBA looks and sounds similar to Cuba, with no other recognized and/or pertinent meaning attached to that particular spelling, we find that the primary significance of KUBA is the

9

geographic meaning of Cuba. Furthermore, the repeated use of KUBA does not alter its impression as a geographic term. See, for example, In re Litehouse Inc., 82 USPQ2d 1471, 1474 (TTAB 2007) (CAESAR!CAESAR! merely descriptive of salad dressing); In re Disc Jockeys, Inc., 23 USPQ2d 1715, 1716 (TTAB 1992) (DJDJ merely descriptive of disc jockey services); In re Juleigh Jeans Sportswear Inc., 24 USPQ2d 1694 (TTAB 1992) (LONDON LONDON geographically deceptive of clothing). Contrary to applicant's contention, it is not significant that the cited cases involve the repetition of the "dictionary spelling" of descriptive terms. The mere repetition of this slightly misspelled version of the geographic term Cuba imparts no new or different meaning to KUBA apart from its meaning as a reference to Cuba. There is nothing in the composite mark KUBA KUBA either visually or conceptually which causes the word KUBA to lose its meaning as a reference to Cuba.

We find that the term KUBA KUBA denotes Cuba, a well known geographic location, and moreover, that the geographic meaning of the mark is its primary meaning.[11]

---

[11] Applicant states in its brief that after this appeal was instituted, applicant acquired by way of an assignment a registration on the Principal Register for the mark KUBA CIGARS and design (Registration No. 3370675) for cigars made from Cuban seed tobacco (among other products). Applicant did not request a remand to properly make this registration of record, and we do not take judicial notice of registrations residing in the Office. We recognize the Federal Circuit exercised its discretion to take judicial notice of third-party registrations in an *ex parte* appeal. In re Chippendales USA, Inc., 622

## Goods/Place Association and Origin of the Goods

As noted above, the *Gazetteer* and website evidence submitted by the examining attorney establishes, and applicant does not dispute, that cigars are produced in Cuba.  Furthermore, applicant effectively concedes that its tobacco products and cigars will not originate in Cuba and, moreover, applicant specifically states that it does not intend to use the mark in connection with cigars made from Cuban seed tobacco.  Resp., March 9, 2009.  Accordingly, we find that the relevant public would be likely to believe that applicant's cigars offered under the mark KUBA KUBA come from Cuba, i.e., that a goods/place association exists, when in fact the goods will not come from that place.  See *California Innovations*, supra at 1857 (noting the "relatively easy burden of showing a naked goods-place association.").

---

F.3d 1346, 96 USPQ2d 1681, 1688 (Fed. Cir. 2010).  However, the Board's well-established practice is not to take judicial notice of registrations that reside in the USPTO, and we do not take judicial notice of applicant's late-filed registration here.  See In re Jump Designs LLC, 80 USPQ2d 1370, 1372-73 (TTAB 2006); In re Volvo Cars of North America Inc., 46 USPQ2d at 1456 n.2; In re Duofold Inc., 184 USPQ 638, 640 (TTAB 1974).  We add that even if the registration was properly of record, it would not help applicant overcome the Section 2(e)(3) refusal because, as discussed below, applicant's cigars under the KUBA KUBA mark will neither originate in Cuba nor be made from Cuban seed tobacco.

## Materiality

"[I]n order to establish a prima facie case of materiality there must be some indication that a substantial portion of the relevant consumers would be materially influenced in the decision to purchase the product or service by the geographic meaning of the mark."  In re Spirits International N.V., 563 F.3d 1347, 90 USPQ2d 1489, 1495 (Fed. Cir. 2009) (finding that the materiality test of Section 2(e)(3) embodies a requirement that a "substantial portion" of the relevant consumers is likely to be deceived).

The *Gazetteer* and website evidence submitted by the examining attorney establishes not only that tobacco and cigars are produced in Cuba, but that cigars are an important product of Cuba, that Cuba is known for high quality tobacco and that Cuba is known for and famous for its cigars.  Because we have determined that the primary significance of KUBA KUBA to the relevant public is the geographic place, Cuba, and in view of the demonstrated fame and reputation of Cuban cigars to the relevant public, we may infer that at least a substantial portion of consumers who encounter KUBA KUBA on applicant's cigars are likely to be deceived into believing that the cigars come from Cuba.  Cf., for example, In re Boulevard Entertainment, Inc., 334 F.3d 1336, 1339, 67 USPQ2d 1475, 1478 (Fed. Cir. 2003) ("dictionary evidence alone can be sufficient to satisfy the

PTO's burden" of showing that "a substantial composite of the general public considers a word scandalous."). See *California Innovations*, supra, citing In re Save Venice New York, Inc., 259 F.3d 1346, 59 USPQ2d 1778 (Fed. Cir. 2001); In re Loew's Theatres, Inc., 769 F.2d 764, 226 USPQ 865, 868 n.6 (Fed. Cir. 1985); and In re House of Windsor, 221 USPQ 53, 56-57 (TTAB 1983); finding, respectively, that materiality may be inferred from a showing that the goods are "a principal product" of the place named in the mark, that the place is "noted for" the goods, or that the goods are, or are related to, the "traditional" products of the place named in the mark.

Applicant argues, citing *Spirits* and *California Innovations*, that the USPTO's burden of establishing deceptiveness now requires a higher showing of deceptiveness, and that there has been no showing in this case that a substantial portion of the relevant consumers would be materially influenced to purchase applicant's products. In support of this contention, applicant quotes *California Innovations* as stating, "A mere inference, however, is not enough to establish the deceptiveness that brings the harsh consequence of non-registrability...."

First, applicant has missed the context for the Federal Circuit's statement. The Court in fact was referring to an inference of deception based on a "naked" goods-place association which the Court found would not be sufficient to establish

13

materiality.  On the other hand, it has been consistently held, as noted above, that a strong or heightened goods/place association, which we have here, is sufficient to support a finding of materiality.

Second, to the extent that applicant is arguing, as it did at the oral hearing, that even assuming KUBA KUBA is perceived as Cuba, evidence allowing the Board to draw an inference of materiality is not sufficient and that direct evidence of public deception is required, we do not agree.  It is well settled that evidence of what the relevant public understands a term to mean may be shown not only by direct evidence, such as consumer testimony and surveys, but it may also be inferred from indirect or circumstantial evidence, such as gazetteer entries and third-party websites, as we have in this case.  See In re Merrill Lynch, Pierce, Fenner and Smith Inc., 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987).  See also *Bayer*, supra (online sources are probative of how a term would be perceived); In re Reed Elsevier Properties Inc., 482 F.3d 1376, 82 USPQ2d 1378, 1381 (Fed. Cir. 2007) ("third-party websites are competent sources to show what the relevant public would understand a term to mean").

Further, we do not read the Court's decision in *Spirits* as departing from the Court's longstanding precedent which has permitted inferences of materiality to be drawn from the

14

evidence, and serving as proof that a substantial portion of the relevant public will be deceived.

In the *Spirits* case, the Court reversed the Board's finding that MOSKOVSKAYA, translated as "from Moscow," was geographically deceptively misdescriptive of vodka. The Board found that Moscow was noted for vodka, and that Russian speakers who would translate the mark as "from Moscow" would be deceived into believing that the vodka came from Moscow. The problem in that case was not with the Board's inference that Russian speakers would be deceived. The problem concerned the Board's failure to consider "whether Russian speakers were a 'substantial portion of the intended audience'" for vodka. The Court noted that if the relevant public is defined as the entire U.S. population interested in purchasing vodka, then Russian speakers, which comprise just a small fraction (0.25%) of the population, would not "by any measure" constitute a substantial portion. The Court did not say or suggest that the evidence must show that a substantial portion of the relevant public would actually be deceived, or that indirect evidence of consumer perception of the mark, as we have in the present case, would not be sufficient.[12]

---

[12] Indeed, as the Court in *Spirits* observed, "it may be that Russian speakers are a greater percentage of the vodka-consuming public; that some number of non-Russian speakers would understand the mark to suggest that the vodka came from Moscow; and that these groups would together be a substantial portion of the intended audience." Id., at 1496.

15

The Federal Circuit's decision In re Pacer Tech., 338 F.3d 1348, 67 USPQ2d 1629, 1631 (Fed. Cir. 2003) is instructive on this point.  In discussing the Court's earlier decision in *Loews*, supra, concerning whether the use of "Durango" for tobacco was primarily geographically deceptively misdescriptive, the Court stated (emphasis in *Pacer*):

> We disagreed that the PTO, as part of its *prima facie* case, must establish an actual goods/place association.  We reasoned that the PTO "does not have means" to undertake the research, such as a marketing survey, necessary to prove that the public would actually make the goods/place association asserted. We consequently required the PTO only to establish "a *reasonable predicate* for its conclusion that the public would be *likely* to make the particular goods/place association on which it relies," and not that the public would actually make the asserted association.  [Citations omitted.]

The same reasoning applies to the materiality element of the Section 2(e)(3) test.  In the present case, the evidence is sufficient to establish a reasonable predicate that a substantial portion of relevant consumers would understand that KUBA KUBA refers to Cuba,[13] and thus we may infer from the evidence showing that Cuba is famous for cigars, that a substantial portion of

---

[13] In the present case, although there is limited evidence of media or public usage of "Kuba" as referring to Cuba, the similarity of KUBA to Cuba with respect to sound, appearance and meaning is sufficient to establish that KUBA would be recognized by most consumers as Cuba.  See *Bayer*, supra at 1832 ("the significant similarities in appearance and meaning of ASPIRINA and aspirin [noting that both terms will be used in association with the same analgesic goods] demonstrate that the Board's finding that ASPIRINA is merely descriptive of analgesic goods is supported by substantial evidence.")

relevant consumers would be deceived.[14]  See In re Les Halles De

Paris J.V., 334 F.3d 1371, 67 USPQ2d 1539, 1541 (Fed. Cir. 2003)

("[f]or goods, the PTO may raise an inference in favor of

materiality with evidence that the place is famous as a source of

the goods at issue.").

---

[14] In this regard, we note the District Court's ruling on appeal of the Board's decision in Corporacion Habanos S.A. v. Guantanamera Cigars Co., 86 USPQ2d 1473 (TTAB 2008).  In that case, the Board sustained the opposition, finding that GUANTANAMERA, a Spanish term meaning "of or from Guantanamo, Cuba," was geographically deceptively misdescriptive of cigars, and applicant filed an appeal to the U.S. District Court for the District of Columbia (Guantanamera Cigar Co., v. Corporacion Habanos, S.A., 729 F.Supp.2d 246, ____ USPQ2d ____ (2010) WL 3035750 (D.D.C. August 5, 2010)).  The Court, in granting applicant's motion for summary judgment, found that the Board erred as a matter of law in applying the materiality requirement set forth in *Spirits*, which as the Court noted was decided after the Board's decision issued.  Opposer contended, on appeal, that the "substantial proportion" requirement of *Spirits* is met, arguing that there are millions of Spanish speakers in the United States, that the English speaking public recognizes "guantanamera" to mean Guantanamo, Cuba, and that applicant targeted Spanish speaking consumers.  However, the Court found that "this evidence fails to determine that a substantial proportion of the target audience would be deceived into purchasing the cigars *because* of the false goods-place association" (emphasis in original), stating at one point that "*Spirits* plainly demands more than a finding of Cuba's reputation for high quality cigars."  Id., slip op. at 9, 10. Accordingly, the Court remanded the case to the Board to apply the proper legal standard for materiality.  We need not speculate as to the District Court's requirements for proof of deception.  Suffice it to say that, at most, we read *Spirits* as requiring a showing that a substantial portion of the relevant universe of consumers (however that universe is defined), would recognize the meaning of a foreign language term as denoting a geographic place.  This showing would be sufficient to permit an inference of deception if the place named by the foreign language term is famous for the goods.  In the present case, there is no question that a substantial portion of relevant consumers would recognize the meaning of KUBA KUBA as meaning Cuba; and the evidence showing that Cuba is famous for cigars provides a reasonable predicate for finding that a substantial portion of the relevant consumers would be deceived.

As a final matter, we note applicant's argument that even if consumers view the term KUBA KUBA as related to Cuba, they would not likely believe that the goods originate in Cuba because of the U.S. embargo on Cuban products. That argument has been previously considered and rejected by the Board. See In re Boyd Gaming Corp., 57 USPQ2d 1944, 1946 (TTAB 2000) (noting that the embargo provides no justification for registration); In re Bacardi & Co. Ltd., 48 USPQ2d 1031, 1035 (TTAB 1997) ("regardless of the existence of trade sanctions against Cuba, we have determined that the marks herein would be subject to refusal under Section 2(e)(2), if the identified goods are intended to originate in HAVANA, or Section 2(e)(3), if the identified goods are not intended to originate in HAVANA."). It is the perception of the mark by the public which controls whether the mark is primarily geographically deceptive, and applicant has offered no evidence that the embargo on Cuban products would have any effect on the perception of KUBA KUBA as a geographically deceptive term.

**Decision:** In view of the foregoing, we find that the evidence shows prima facie that the mark KUBA KUBA is primarily geographically deceptively misdescriptive as applied to cigars, and that applicant's evidence and arguments fail to rebut this prima facie showing.

The refusal to register under Section 2(e)(3) is affirmed.