# United States Court of Appeals for the Federal Circuit

2008-1369
(Serial No. 74/382,759)

IN RE SPIRITS INTERNATIONAL, N.V.

Bingham B. Leverich, Covington & Burling LLP, of Washington, DC, argued for appellant. With him on the brief were Marie A. Lavalleye and Hope Hamilton.

Thomas V. Shaw, Associate Solicitor, Office of the Solicitor, United States Patent and Trademark Office, of Arlington, Virginia, argued for the Director of the United States Patent and Trademark Office. Of counsel was Raymond T. Chen, Solicitor. On the brief was Shannon M. Hansen, Associate Solicitor.

Appealed from:    United States Patent and Trademark Office
                  Trademark Trial and Appeal Board

# United States Court of Appeals for the Federal Circuit

2008-1369
(Serial No. 74/382,759)

IN RE SPIRITS INTERNATIONAL, N.V.

Appeal from the United States Patent and Trademark Office Trademark Trial and Appeal Board.

_____

DECIDED:    April 29, 2009

_____

Before RADER, LINN, and DYK, Circuit Judges.

DYK, Circuit Judge.

Spirits International B.V. (formerly Spirits International N.V.) ("Spirits"), appeals a decision of the Trademark Trial and Appeal Board ("Board"). The Board affirmed a decision by an examining attorney at the U.S. Patent and Trademark Office ("PTO") refusing to register Spirits' mark—MOSKOVSKAYA—for vodka. In re Spirits Int'l N.V., 86 USPQ2d 1078 (TTAB 2008). The Board concluded that the mark was primarily geographically deceptively misdescriptive under 15 U.S.C. § 1052(e)(3). Because the Board applied an incorrect test for materiality in determining that the mark was geographically deceptive, we vacate and remand.

BACKGROUND

Spirits filed an application for use of the mark MOSKOVSKAYA for vodka on April 22, 1993, based on an allegation of bona fide intention to use the mark in commerce. Spirits admitted that the vodka "will not be manufactured, produced or sold in Moscow and will not have any other connection with Moscow." Id. at 1081. On August 31, 1993, the examining attorney refused registration. On March 28, 1994, further action on the application was suspended while dispositions of three similar applications filed before April 22, 1993, were pending. On March 13, 2006, after each of these prior applications was abandoned, the Final Office Action issued, refusing registration on the ground that MOSKOVSKAYA is primarily geographically deceptively misdescriptive.

Applying the doctrine of foreign equivalents (discussed below), the examining attorney translated the mark from Russian and found that the primary significance of the mark thus translated was "of or from Moscow." The examining attorney then found that Moscow was a generally known geographic location and that the public would likely believe the goods were from Moscow because there was a goods/place association between vodka and Moscow. Finally, the examining attorney found that this belief would likely be material to consumers because Russian vodka is highly regarded.

On September 1, 2006, Spirits filed a response and motion for reconsideration. Spirits contended that the rejection was inappropriate. In that connection it relied on a mall-intercept survey sponsored by Spirits. On November 2, 2006, the examining attorney denied the motion for reconsideration. Spirits sought review by the Board, and on February 11, 2008, the Board affirmed.

The Board analyzed the mark under 15 U.S.C. § 1052(e)(3), which prohibits the registration of marks that are primarily geographically deceptively misdescriptive of the goods. Citing our decision In re California Innovations, Inc., 329 F.3d 1334 (Fed. Cir. 2003), the Board noted that the analysis of whether a mark should be rejected under subsection (e)(3) had recently changed to include a requirement that the mark materially deceive the public. The Board stated the following requirements for establishing a prima facie case that a mark is primarily geographically deceptively misdescriptive of the goods:

> (1) the mark's primary significance is a generally known geographic location; (2) the relevant public would be likely to believe that the goods originate in the place named in the mark (i.e., that a goods/place association exists) when in fact the goods do not come from that place; and (3) the misrepresentation is a material factor in the consumer's decision.

Spirits, 86 USPQ2d at 1081. Like the examining attorney, the Board, under the doctrine of foreign equivalents, translated the mark into English and found that the primary significance of the mark was a generally known geographic location, establishing the first element of the prima facie case. The Board also found that Moscow is well known for vodka, and that this established the second element. Id. at 1086.

The Board also found that Moscow is reputed for high quality vodka, and thus that the public would likely be materially influenced by the mark in the purchasing decision. Id. In analyzing the materiality element, the Board stated that "an appreciable number of consumers for the goods or services at issue" must be deceived. Id. at 1085. But the Board concluded that "it is never necessary to show that all, or even most, of the relevant consumers would be deceived. All that is required is a showing that some

portion of relevant consumers will be deceived." Id. at 1084 (emphasis added). The Board found that the mark met the materiality requirement because of its deception to Russian speakers.

The Board concluded that there is a "presum[ption] that a word in one of the common, modern languages of the world will be spoken or understood by an appreciable number of U.S. consumers for the product or service at issue." Id. at 1085. The Board also took judicial notice of the fact that, according to the 2000 U.S. Census, Russian is spoken by 706,000 people in the United States. Id. The Board then appears to have found that 706,000 people is an "appreciable number" in an absolute sense. The Board found that "[a]t least one significant group of 'ordinary American purchasers' is the purchaser who is knowledgeable in English as well as the pertinent foreign language." Id. The Board therefore concluded that this established a prima facie showing of deception under subsection (e)(3). Id. at 1086.

The Board then discussed the survey offered by the applicant, and found that it did not rebut this prima facie showing. The Board found that the survey was "not persuasive or probative of any issue in this case" for a variety of reasons, but principally because it did not include Russian speakers. Id. at 1088. As a result, the Board affirmed the decision of the examining attorney. Spirits timely appealed to this court, and we have jurisdiction pursuant to 15 U.S.C. § 1071.

DISCUSSION

One aspect of the doctrine of foreign equivalents generally requires considering the meaning of a mark in a non-English language to the speakers of that language. As we stated in Palm Bay, "[u]nder the doctrine of foreign equivalents, foreign words from

common languages are translated into English . . . ." Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772, 396 F.3d 1369, 1377 (Fed. Cir. 2005); In re N. Paper Mills, 64 F.2d 998, 998-99 (CCPA 1933). The doctrine has been summarized in a leading trademark treatise in the context of determining whether a mark is descriptive (or geographically descriptive) under subsections (e)(1) and (e)(2) of the statutory section governing registration:

> Under the "doctrine of foreign equivalents," foreign words are translated into English . . . . However, the "doctrine of foreign equivalents" is not an absolute rule, for it does not mean that words from dead or obscure languages are to be literally translated into English for descriptive purposes.

2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:34 (4th ed. 2009) (hereinafter "McCarthy") (footnotes omitted). The parties do not dispute this general requirement of translation under the doctrine of foreign equivalents. Nor do we.

We also note that there is a threshold limitation on the application of the doctrine of foreign equivalents, as discussed in Palm Bay, 396 F.3d at 1377. In Palm Bay, we noted that the doctrine of foreign equivalents applies only in those situations where the ordinary American consumer would stop and translate the mark into English:

> Although words from modern languages are generally translated into English, the doctrine of foreign equivalents is not an absolute rule and should be viewed merely as a guideline. The doctrine should be applied only when it is likely that the ordinary American purchaser would stop and translate the word into its English equivalent.

Id. (emphases added, citations, quotation marks, and alteration omitted). The "ordinary American purchaser" is not limited to only those consumers unfamiliar with non-English languages; rather, the term includes all American purchasers, including those proficient

in a non-English language who would ordinarily be expected to translate words into English.

As Palm Bay makes clear, there are situations in which the doctrine does not require translation even with respect to foreign language speakers. The ordinary American consumer would not translate VEUVE CLICQUOT because its literal translation would be irrelevant to even those ordinary American consumers who speak French. Palm Bay, 396 F.3d at 1377. Similarly, CORDON BLEU has such a well established alternative meaning that the literal translation is irrelevant because even French speakers would not translate the mark. Cont'l Nut Co. v. Cordon Bleu, 494 F.2d 1397, 1398 (CCPA 1974). Additionally, some marks would not be translated because of the particular context in which they occur. See In re Tia Maria, Inc., 188 USPQ 524, 525-26 (TTAB 1975). There may be many non-English marks that will not be translated in context but instead accepted at face value by the ordinary American consumer, including those familiar with the literal meaning of the mark in the non-English language. As the Board stated in Tia Maria:

> [T]here are foreign expressions that even those familiar with the language will not translate, accepting the term as it is, and situations arise in the marketplace which make it unfeasible or even unlikely that purchasers will translate the brand names or labels appearing on canned foods and other like products.

188 USPQ at 525-26 (emphasis added). However, in this case the applicant does not contend that the specific context of the mark is such that an ordinary American purchaser sufficiently familiar with Russian would nonetheless take the mark at face value.

That is not, however, the end of the inquiry. Once the word or phrase is translated, its impact must be "material" under subsection (e)(3). The question here is the scope of the materiality requirement.

I

We begin with a brief description of the history of subsection (e)(3). As discussed at length in California Innovations, 329 F.3d at 1336-42, current subsection (e)(3) was added by the NAFTA Implementation Act in 1993. Prior to NAFTA, marks that were primarily geographically deceptively misdescriptive were treated together with marks that were primarily geographically descriptive under subsection (e)(2):

> [The PTO shall not register a mark that] when used on or in connection with the goods of the applicant is primarily geographically descriptive or deceptively misdescriptive of them.

15 U.S.C. § 1052(e)(2) (1988); see Cal. Innovations, 329 F.3d at 1336-41; Institut National Des Appellations D'Origine v. Vintners Int'l Co., 958 F.2d 1574, 1580 (Fed. Cir. 1992) (describing the law prior to NAFTA).

The NAFTA Act made two relevant changes to the law. First, the NAFTA Act amended subsection (e)(2) to remove any mention of primarily geographically deceptively misdescriptive marks. Subsection (e)(2) now reads "[the PTO shall not register a mark that] when used on or in connection with the goods of the applicant is primarily geographically descriptive of them . . . ." Second, the NAFTA Act created new subsection (e)(3) specifically dealing with primarily geographically deceptively misdescriptive marks. In doing so, Congress implicitly added a requirement that the PTO establish that the misdescription materially affect the public's decision to purchase

the goods.  Cal. Innovations, 329 F.3d at 1339-40.[1]  Subsection (e)(3) now reads "[the

PTO shall not register a mark that] when used on or in connection with the goods of the

applicant is primarily geographically deceptively misdescriptive of them."  15 U.S.C.

§ 1052(e)(3).

Before the NAFTA Act, it was "quite easy for the PTO to deny registration on the

principal register to geographically deceptively misdescriptive marks under

§ 1052(e)(2)."  Cal. Innovations, 329 F.3d at 1337.  There were two elements: (1) the

primary significance of the mark was a generally known geographic location, and (2) a

consumer would likely believe incorrectly that the mark is an accurate description of the

origin or other association of the goods with the geographic location.  See In re Wada,

194 F.3d 1297, 1299-300 (Fed. Cir. 1999); Cal. Innovations, Inc., 329 F.3d at 1340;

Trademark Manual of Examining Procedure § 1210.01(a) (5th ed. 2007).

In contrast to this pre-existing approach under subsection (e)(2), "the PTO

required a much more demanding finding to reject for geographical deception under

§ 1052(a)," which barred and continues to bar "immoral, deceptive, or scandalous"

marks.  Cal. Innovations, 329 F.3d at 1338.  In order to deny a mark as deceptive under

subsection (a), the PTO has been required to establish, in addition to the two elements

listed above for geographic misdescriptiveness, a third element: that the misdescription

would "materially affect the public's decision to purchase the goods."  Id. at 1336-37.

---

[1]    It should be noted that rejections under both the pre-NAFTA Act (e)(2) and the current (e)(2) are not permanent, but can be overcome upon a showing of acquired distinctiveness/secondary meaning.  On the other hand, post-NAFTA Act (e)(3) rejections are permanent, and so cannot be overcome by acquired distinctiveness. See Cal. Innovations, 329 F.3d at 1336-39.

The "addition of a materiality inquiry [to subsection (e)(3)] equates this test with the elevated standard applied under § 1052(a)." Id. at 1340. Since the NAFTA Act, the deceptiveness of the mark must be material under subsection (e)(3) just as it is under subsection (a).

However, California Innovations did not address the question of whether the materiality test of subsection (e)(3) embodies a requirement that a significant portion of the relevant consumers be deceived. We hold that subsection (e)(3) does incorporate such a requirement, and that the appropriate inquiry for materiality purposes is whether a substantial portion of the relevant consumers is likely to be deceived, not whether any absolute number or particular segment of the relevant consumers (such as foreign language speakers) is likely to be deceived.

In interpreting the materiality requirement of 15 U.S.C. § 1052 (e)(3), it is appropriate to look to the history of subsection (a), which includes the same materiality requirement as modern subsection (e)(3). Cal. Innovations, 329 F.3d at 1340. Subsection (a), together with the original version of subsection (e) covering primarily deceptively misdescriptive marks, was created by § 2 of the Lanham Act. Pub. L. No. 79-489 § 2, 60 Stat. 427, 428-29 (1946). The Lanham Act was enacted to ensure, among other things, federal protection of trademarks in the wake of the Supreme Court's decision in Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), which generally eliminated the authority of the courts to create federal common law. Edward S. Rogers, New Concepts of Unfair Competition Under the Lanham Act, 38 Trademark Rep. 259, 263-64 (1948), reprinted in 54 Trademark Rep. 752, 757 (1964). Congress concluded that "[m]arks used in interstate commerce are properly the subject of Federal regulation.

It would seem as if national legislation along national lines securing to the owners of trade-marks in interstate commerce definite rights should be enacted and should be enacted now."  S. Rep. No. 79-1333, at 5 (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1277.

As the legislative history of the Lanham Act makes clear, subsection (a) was designed to codify common law standards for trademark infringement in the context of the registrability of trademarks under federal law.  Although the Lanham Act departed from the common law in certain respects,[2] the prohibition in § 1052(a) of deceptive marks was not a departure from the prior common law.  The Lanham Act was designed to codify, not change, the common law in this area by prohibiting the registration of deceptive marks that were unenforceable at common law.  The Supreme Court has recognized the appropriateness of construing the Lanham Act provisions dealing with federal trademark registration together with provisions codifying the law concerning the infringement of common law trademarks.  See Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 209-10 (2000); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 767-68 (1992).

We thus must examine the common law to determine the scope of subsection (a).  Before the Lanham Act, deceptive common law trademarks were unenforceable.  This fell under the rubric of the doctrine of "unclean hands," an equitable defense under the common law.  Worden & Co. v. Cal. Fig Syrup Co., 187 U.S. 516, 528 (1903).  This

---

[2]  See Hearing on H.R. 9041 Before the Subcomm. on Trade-Marks of the H. Comm. On Patents, 75th Cong. 71-72 (1938) (statement of Edward S. Rogers, American Bar Association) (describing changes to the interpretations of geographically descriptive marks)).

meant that "if the plaintiff makes any material false statement in connection with . . . any symbol or label claimed as a trade-mark . . . no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained." Id. But the common law doctrine did not apply in situations where a relatively small number of consumers was misled, as was made clear by Justice Holmes' opinion in Coca-Cola Co. v. Koke Co. of America, 254 U.S. 143, 144-47 (1920). There the Supreme Court held that the trademark "Coca-Cola" was not deceptive, and thus did not give rise to a defense of unclean hands to trademark infringement. Id. The Court first described the historical formulation of the beverage involving substantial quantities of the extract of the coca leaf (cocaine) and the extract of the cola nut. Id. The Court noted that the formulation of the beverage had changed over the years, and no longer contained significant quantities of coca or cola. Id. On this basis the defendant asserted that the mark was now deceptive. The Court stated that "[o]f course a man is not to be protected in the use of a device the very purpose and effect of which is to swindle the public" but that this defense was not "a very broad" one and "should be scrutinized with a critical eye." Id. Although the Court noted that there may be some people "here and there" who would drink the beverage because they thought it contained cocaine, this was insufficient to invoke the unclean hands doctrine because the mark "conveyed little or nothing [about the contents of the drink] to most who saw it." Id. (emphasis added).

The same common law requirement continues to this day. For example, the Restatement (Third) of Unfair Competition § 32 cmt. b discusses unclean hands and states that "a designation used as a trademark [that] . . . misdescribes the goods . . . in

a manner <u>likely to influence the purchasing decisions of a significant number of</u> <u>prospective purchasers</u> . . . is deceptive" (emphasis added). <u>See also</u> <u>id.</u> § 14 cmt. c.

A similar requirement applies in the analogous area of deceptive advertising under section 43(a) of the Lanham Act,[3] a provision which also covers the infringement of common law marks. The common law of false advertising requires deception of a significant portion of the audience. Again, the Restatement concludes:

> In many instances a representation may be likely to deceive or mislead only some of the prospective purchasers to whom it is directed. A person is subject to liability under this Section only if the representation is <u>likely to deceive or</u> <u>mislead a significant portion of the audience</u>.

Restatement (Third) of Unfair Competition § 2 cmt. d (emphasis added).

---

[3] Section 43(a)(1) provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

The courts have also recognized a proportionality requirement for materiality in false advertising cases, requiring that a substantial portion of the audience be deceived. In <u>Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.</u>, 19 F.3d 125, 129-30 (3d Cir. 1994), the Third Circuit discussed the proof required to establish that a mark that was not literally false was nonetheless deceptive. The court stated that there must be proof of "at least a tendency to deceive a <u>substantial portion</u> of the intended audience [and] that the deception is material in that it is likely to influence purchasing decisions." <u>Id.</u> at 129(quoting <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.</u>, 898 F.2d 914, 922-23 (3d Cir. 1990)). The advertising in question in that case described an antacid as the "strongest antacid there is." <u>Id.</u> at 127. The claim was not literally false, but would be misleading if it suggested that the advertised antacid provided superior relief to consumers. Numerous surveys were entered into evidence by both sides purporting to show that the commercials did or did not "mislead consumers into thinking that [the advertised antacid] promises superior relief." <u>Id.</u> at 136. The district court had found "that the consumer surveys in this case did not prove that a substantial number of consumers were misled." <u>Id.</u> Applying the substantial portion standard, the Third Circuit upheld the district court's finding that the advertising was not deceptive or misleading. <u>Id.</u>

Though varying linguistic formulations have been used, the wide consensus of the courts of appeals is consistent with the conclusion of the Third Circuit in <u>Johnson & Johnson-Merck</u> that the mark or advertising must deceive a substantial portion of the relevant consumers. <u>See, e.g.</u>, <u>Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.</u>, 270 F.3d 298, 323 (6th Cir. 2001) ("tends to deceive a substantial portion of the

intended audience"); <u>Clorox Co. P.R. v. Proctor & Gamble Commercial Co.</u>, 228 F.3d 24, 33 n.6 (1st Cir. 2000) ("tendency to deceive a substantial segment of its audience"); <u>United Indus. Corp. v. Clorox Co.</u>, 140 F.3d 1175, 1180 (8th Cir. 1998); <u>William H. Morris Co. v. Group W, Inc.</u>, 66 F.3d 255, 258 (9th Cir. 1995) (stating that less than 3% is "[s]uch a small percentage" that it "does not constitute proof that a significant portion of recipients were deceived"); <u>Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.</u>, 960 F.2d 294, 297-98 (2d Cir. 1992) ("a statistically significant part of the commercial audience").[4] <u>See generally</u> Richard J. Leighton, <u>Materiality and Puffing in Lanham Act False Advertising Cases: The Proofs, Presumptions, and Pretexts</u>, 94 Trademark Rep. 585 (2004).

Under the circumstances it is clear that section (e)(3)—like subsection (a), the false advertising provision of the Lanham Act, and the common law—requires that a significant portion of the relevant consuming public be deceived. That population is often the entire U.S. population interested in purchasing the product or service. We note that, in some cases, the use of a non-English language mark can be evidence that the product in question is targeted at the community of those who understand that language. In such cases, the relevant consuming public will be composed of those who are members of that targeted community, and, as a result, people who speak the non-English language could comprise a substantial portion of the relevant consumers. <u>See</u>

---

[4] <u>See also</u> <u>Stiffel Co. v. Westwood Lighting Group</u>, 658 F. Supp. 1103, 1114-16 (D.N.J. 1987) (stating that a preliminary injunction is warranted if a "not insubstantial number of consumers receive a false or misleading impression" (quotation omitted) and finding survey evidence that "somewhere between 16% and 40% of the trade buyers will be misled" met this standard); <u>Skil Corp. v. Rockwell Int'l Corp.</u>, 375 F. Supp. 777, 783 (N.D. Ill. 1974) ("have the tendency to deceive a substantial segment of their audience").

2 McCarthy § 11:35 (discussing In re New Yorker Cheese Co., 130 USPQ 120 (TTAB 1961) (mark in Polish for canned ham marketed toward the Polish community)). There is no such contention here.[5]

II

We turn then to this particular case. In this case, as in every case, in order to establish a prima facie case of materiality there must be some indication that a substantial portion of the relevant consumers would be materially influenced in the decision to purchase the product or service by the geographic meaning of the mark. Here the Board properly recognized that in order to be deceptive, foreign language marks must meet the requirement that "an appreciable number of consumers for the goods or services at issue will be deceived." In re Spirits, 86 USPQ2d at 1085. The problem with the Board's decision is that it elsewhere rejected a requirement of proportionality, and discussed instead the fact that Russian is a "common, modern language[] of the world [that] will be spoken or understood by an appreciable number of

---

[5] There are cases applying the doctrine of foreign equivalents somewhat differently in other contexts. See, e.g., Weiss Noodle Co. v. Golden Cracknel & Specialty Co., 290 F.2d 845 (CCPA 1961) (denying registration of a generically descriptive mark in Hungarian); In re N. Paper Mills, 64 F.2d at 998-99 (prohibiting registration of a descriptive non-English mark regardless of "the idea which [the mark] may, or may not, convey to the general public" (quotations omitted)); see also Enrique Bernat F., S.A. v. Guadalajara, Inc., 210 F.3d 439, 443 (5th Cir. 2000) (stating, in the likelihood of confusion context, that "one policy undergirding the doctrine [of foreign equivalents] is 'the assumption that there are (or someday will be) customers in the U.S. who speak that foreign language'" (quoting Otokoyama Co. v. Wine of Japan Imp., Inc., 175 F.3d 266, 270 (2d Cir. 1999) (also in the likelihood of confusion context))). We also note that the Article 6 bis of the Paris Convention, which addresses the refusal to register "well known" marks in other countries, specifically mentions translation. See 5 McCarthy § 29:4. In this case we address only subsection (e)(3) and its materiality requirement. We have no occasion here to decide the scope of the doctrine of foreign equivalents in other contexts.

U.S. consumers for the product or service at issue," such number being in this case 706,000 people, according to the 2000 Census. Id. The Board, however, failed to consider whether Russian speakers were a "substantial portion of the intended audience." Because the Board applied an incorrect test, a remand is required.

We express no opinion on the ultimate question of whether a substantial portion of the intended audience would be materially deceived. We note that only 0.25% of the U.S. population speaks Russian. Appellant's Br. 26. If only one quarter of one percent of the relevant consumers was deceived, this would not be, by any measure, a substantial portion. However, it may be that Russian speakers are a greater percentage of the vodka-consuming public; that some number of non-Russian speakers would understand the mark to suggest that the vodka came from Moscow; and that these groups would together be a substantial portion of the intended audience.

We remand to the Board for a determination of whether there is a prima facie case of material deception under the correct legal test in the first instance. Because of our disposition on the question of the prima facie case, we do not reach the questions raised by the appellant as to the Board's rejection of the survey as rebutting the prima facie case, though we note that the Board's holding as to this issue was heavily influenced by its incorrect view of materiality.

VACATED and REMANDED

COSTS

No costs.