# United States Court of Appeals for the Federal Circuit

---

**IN RE: VETEMENTS GROUP AG,**
*Appellant*

---

2023-2050, 2023-2051

---

Appeals from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Nos. 88/944,198, 88/946,135.

---

Decided: May 21, 2025

---

TERENCE J. LINN, Gardner, Linn, Burkhart & Ondersma LLP, Grand Rapids, MI, argued for appellant. Also represented by CATHERINE S. COLLINS, KARL T. ONDERSMA.

ERICA JEUNG DICKEY, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA, argued for appellee Coke Morgan Stewart. Also represented by CHRISTINA J. HIEBER, AMY J. NELSON.

---

Before PROST, WALLACH, and CHEN, *Circuit Judges*.

WALLACH, *Circuit Judge*.

*Vêtement* is the French word for clothing in English.[1] Appellant Vetements Group AG ("Appellant") appeals the decision of the United States Patent and Trademark Office ("PTO") Trademark Trial and Appeal Board ("Board"), which affirmed the Examining Attorney's refusal to register the proposed marks: VETEMENTS in standard characters and in stylized form.[2] The Board concluded after applying the foreign equivalents doctrine that the marks were generic and merely descriptive without acquired distinctiveness under Section 2(e)(1) of the Trademark Act. 15 U.S.C. § 1052(e)(1). The Board's decision is supported by substantial evidence and in accordance with law, so this Court affirms.

## BACKGROUND

In June 2020, Appellant filed applications for registration on the Principal Register of two marks: VETEMENTS, in standard characters, and **VETEMENTS**, in stylized form (capital block lettering in customized font), in connection with "[s]hirts, skirts, sweaters, coats, jackets, suits, caps, headwear, hats, hoods, visors, scarves, gloves, shoes, boots, waist belts, t-shirts, pants, blouses, dresses" in

---

[1]    It is undisputed that the English translation of "VETEMENTS" in the mark is "CLOTHING." Oral Arg. at 10:07–10:21, 13:34–41 (available at https://oralarguments.cafc.uscourts.gov/default.aspx?fl=23-2050_02072025.mp3).

[2]    The Board's Opinion affirming the rejection of Appellant's marks is in the record at Appx1–45, and is available at *In re Vetements Group AG*, Nos. 88944198, 88946135, 2023 WL 3271156 (T.T.A.B. Apr. 21, 2023).

International Class 25 and "[o]nline retail store services for" the same in International Class 35.[3]   Appx51–58; Appx478–84.

The Examining Attorney refused the applications in Final Office Actions in December 2021, on the ground that the marks as applied to clothing and online retail store services for clothing were generic, or in the alternative, merely descriptive without acquired distinctiveness, and were barred from registration under 15 U.S.C. § 1052(e)(1).  Appellant filed an appeal to the Board.

The Board affirmed the genericness and "alternative mere descriptiveness refusals" as well as the Examining Attorney's finding that Appellant failed to establish acquired distinctiveness.  Appx1–3.  In reaching its conclusion, the Board applied the doctrine of foreign equivalents. The Board found that, as of 2010, French is the fifth-most spoken non-English language at home, and it is the second most widely taught non-English language in schools in the United States.  The Board reasoned that VETEMENTS is subject to the doctrine of foreign equivalents because the ordinary American purchaser is likely to stop and translate the marks into English, particularly because they are the French word for clothing and are used in connection with pieces of clothing and clothing-related retail services.

After translating the marks, the Board then considered the marks under the test for genericness, which asks whether the marks would be understood by the consuming public for the identified goods and services primarily to refer to the genus of goods or services under consideration. *See H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 989–90 (Fed. Cir. 1986).  Using the marks'

---

[3]   The original applications identified goods and services that are not part of this appeal and not relevant here because they were divided out into child applications.

translation, the Board found that members of the relevant public would primarily understand the marks to "refer[]to a genus of clothing items and online retail store services featuring clothing items," thus making them generic. Appx17. The Board also found the proposed marks were highly descriptive. It determined that Appellant failed to establish that the proposed "VETEMENTS" marks have acquired distinctiveness among relevant U.S. consumers as a source identifier for Appellant's goods and services. The Board accordingly affirmed the Examining Attorney's refusal to register the marks.

Appellant filed this timely appeal. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(B).

STANDARD OF REVIEW

This Court reviews the Board's conclusions of law de novo and factual findings for substantial evidence. *E.g.*, *In re Cordua Rests., Inc.*, 823 F.3d 594, 599 (Fed. Cir. 2016). "The standard of genericness is a question of law that we review de novo." *Id.* (citing *In re Save Venice N.Y., Inc.*, 259 F.3d 1346, 1351–52 (Fed. Cir. 2001)). Findings of genericness and acquired distinctiveness are "factual determinations that we review for substantial evidence." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015). "Whether the Board applied the proper test in assessing whether a mark is generic is a question of law, but 'whether a particular mark is generic under the applicable standard is a question of fact, which we review for substantial evidence.'" *In re PT Medisafe Techs.*, 134 F.4th 1368, 1373 (Fed. Cir. 2025) (quoting *Cordua*, 823 F.3d at 599). A finding is supported by substantial evidence if a reasonable mind might accept the evidence as "adequate to support a conclusion." *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 971 (Fed. Cir. 2018).

## LEGAL STANDARDS

### A.

A mark cannot be registered which "when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them." 15 U.S.C. § 1052(e)(1). The term "descriptive" encompasses generic terms because a generic term is the "ultimate in descriptiveness." *Bullshine Distillery LLC v. Sazerac Brands, LLC*, 130 F.4th 1025, 1029 (Fed. Cir. 2025) (quoting *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1366 (Fed. Cir. 2018)). "[G]eneric terms by definition are incapable of indicating source." *In re Hotels.com, L.P.*, 573 F.3d 1300, 1302 (Fed. Cir. 2009). A generic name is "ineligible for federal trademark registration." *U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 551 (2020). "The statute prevents registration of a generic term because it would deceive consumers as to the origin of a good." *Bullshine Distillery*, 130 F.4th at 1029.

### B.

### 1.

The doctrine of foreign equivalents is used to ascertain if a non-English word mark is impermissibly generic or descriptive by translating the mark into English and then considering its genericness or descriptiveness. *E.g.*, *In re N. Paper Mills*, 64 F.2d 998, 998–99 (C.C.P.A. 1933).[4]

---

[4] The decisions of our predecessor court, the Court of Customs and Patent Appeals, have been adopted as precedent of this Court. *S. Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc).

The doctrine of foreign equivalents originated in our precedent in the 1933 case of *Northern Paper Mills*.[5] *Northern Paper Mills* affirmed the rejection of a trademark for "Gasa" for toilet paper, explaining that "Gasa," a Spanish word meaning gauze, "as applied to toilet paper, was descriptive of the supposed quality of the paper."  64 F.2d at 998–99 (rejecting argument that the "English equivalent of the word sought to be registered, namely, 'Gauze,' is not descriptive of toilet paper").  The court reasoned "that a word taken from a well-known foreign modern language, which is, itself, descriptive of a product, will be so considered when it is attempted to be registered as a trade-mark in the United States for the same product."  *Id.*  ("[A] descriptive word, used in one of the modern languages of the principal nations of the world, cannot be properly registered as a trade-mark under the present laws of the United States on that subject.").

Our cases have rejected the registrability of proposed marks in non-English languages that are merely descriptive words after translating them under the doctrine of foreign equivalents.  *Bart Schwartz* affirmed the cancellation of the mark, "FIOCCO" for "textile fabrics in the piece of cotton, rayon, synthetic fibers, and mixtures thereof."  *Bart Schwartz Int'l Textiles, Ltd. v. FTC*, 289 F.2d 665, 667, 672 (C.C.P.A. 1961).  *Bart Schwartz* explained that because

---

[5]    Numerous cases from other circuits concerned marks of non-English language words that were descriptive of a product and pre-dated *Northern Paper Mills.  See, e.g., In re Bradford Dyeing Ass'n*, 46 App. D.C. 512, 513 (D.C. Cir. 1917) (affirming the Commissioner of Patents' refusal to register "E'clatant" as a trademark for cotton piece goods because the word is French and, when translated, means "brilliant, shining, glittering, etc.," which is "descriptive of the character and quality of the goods"), *cited in N. Paper Mills*, 64 F.2d at 998 (collecting cases).

"fiocco" is an Italian word referring to fabrics "made wholly or in part of spun rayon," the word's "prior use by others," to descriptively identify the fiber content of textile fabrics was known but fraudulently concealed in the registrant's sworn declaration as to its ownership of the mark. *Id.* at 667–69, 671. The court explained in dicta that because there "is no question but that the Italian word 'fiocco' is descriptive of 'spun rayon,'" it is thus "subject to the general rule that a descriptive word in a foreign language cannot be registered in the United States as a trademark for the described product." *Id.* at 668 (citing *N. Paper Mills*, 64 F.2d 998).

*Weiss Noodle* affirmed the rejection of a trademark for "Ha-Lush-Ka" for egg noodles and egg noodle products. *Weiss Noodle Co. v. Golden Cracknel & Specialty Co.*, 290 F.2d 845, 846, 848 (C.C.P.A. 1961). "Ha-Lush-Ka" was a hyphenated, phonetically spelled version of the Hungarian word for noodles—Haluska or Galuska—which, as the Board found, was the "common descriptive name for egg noodles." *Id.* at 846. The court reasoned that the mark was merely descriptive and not registrable because "[t]he name of a thing is the ultimate in descriptiveness. It is immaterial that the name is in a foreign language." *Id.* at 847 (internal citation omitted) (citing *N. Paper Mills*, 64 F.2d 998).

2.

The doctrine of foreign equivalents has been considered by this Court in other trademark contexts. In *Palm Bay*, this Court considered the doctrine in the context of likelihood of confusion—"to determine . . . similarity of connotation in order to ascertain confusing similarity with English word marks." *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1377 (Fed. Cir. 2005); *see also* 15 U.S.C. § 1052(d) (prohibiting registration when a proposed mark is "likely . . . to cause confusion, or to cause mistake" with another mark).

This Court in *Palm Bay* considered an appeal of the Board's likelihood-of-confusion rejection of a trademark for a non-English mark, "VEUVE ROYALE." 396 F.3d at 1371. *Palm Bay* explained that "[a]lthough words from modern languages are generally translated into English, the doctrine of foreign equivalents is not an absolute rule and should be viewed merely as a guideline." *Id.* at 1377. "When it is unlikely that an American buyer will translate the foreign mark and will take it as it is, then the doctrine of foreign equivalents will not be applied." *Id.* (citing *Tia Maria, Inc.*, 188 U.S.P.Q. (BNA) 524 (T.T.A.B. 1975)).[6] "The doctrine should be applied only when it is likely that the ordinary American purchaser would 'stop and translate [the word] into its English equivalent.'" *Id.* (alteration in original) (citation omitted). *Palm Bay* declined to translate the mark to analyze its English equivalent's potential confusing similarity to the opposer's mark ("THE WIDOW"). *Id. Palm Bay* determined "it [was] improbable that the average American purchaser would stop and translate

---

[6]     In *Tia Maria*, "Tia Maria" was a Mexican restaurant, and the "Aunt Mary's" mark was used for canned fruits and vegetables sold at a supermarket. 188 U.S.P.Q. (BNA) at 525–26. The Board held it was unlikely that a person encountering "AUNT MARY'S" canned fruits and vegetables on the shelves of a supermarket would, "upon dining at the 'TIA MARIA' restaurant in Mexican decor and surrounded by a menu of Mexican delicacies, translate 'TIA MARIA' into 'AUNT MARY' and then mistakenly assume that the 'TIA MARIA' restaurant and 'AUNT MARY'S' canned fruits and vegetables originate from or are sponsored by the same entity." *Id.* at 526. The Board concluded in *Tia Maria* that those shopping in a supermarket, "even those familiar with the language," would be unlikely to translate the mark "AUNT MARY'S" on a can of vegetables to TIA MARIA and confuse the two brands. *Id.* at 525–26.

'VEUVE' into 'widow.'" *Id.* The Court reversed the Board's finding of the likelihood of confusion as to the opposer's "THE WIDOW" mark. *Id.*[7]

This Court in *In re Spirits* considered the doctrine of foreign equivalents in the context of geographic descriptiveness and deceptive mis-descriptiveness. *In re Spirits Int'l, N.V.*, 563 F.3d 1347, 1349–50 (Fed. Cir. 2009); *see also id.* at 1353 (explaining the requirement that "the misdescription materially affect the public's decision to purchase the goods"); 15 U.S.C. § 1052(e)(3) (prohibiting registration of a mark that "when used on or in connection with the goods of the applicant is primarily geographically deceptively misdescriptive of them"). *Spirits* was an appeal of the Board's refusal to register a mark—MOSKOVSKAYA—for vodka. 563 F.3d at 1349–50.

*Spirits* noted that for the doctrine of foreign equivalents, "[t]he 'ordinary American purchaser' is not limited to only those consumers unfamiliar with non-English languages; rather, the term includes all American purchasers, including those proficient in a non-English language who would ordinarily be expected to translate words into English." 563 F.3d at 1352. At the same time, "[t]here may be many non-English marks that will not be translated in context but instead accepted at face value by the ordinary American consumer, including those familiar with the literal meaning of the mark in the non-English language." *Id.* Thus, "there are situations in which the doctrine does not

---

[7]   *Palm Bay*, despite reversing the Board on confusing similarity to the opposer's English mark, affirmed the Board's overall decision refusing registration of the mark VEUVE ROYALE for sparkling wine on the ground of likelihood of confusion with two of opposer Veuve Clicquot Ponsardin's other marks: (1) VEUVE CLICQUOT PONSARDIN, and (2) VEUVE CLICQUOT. 396 F.3d at 1377.

require translation even with respect to foreign language speakers." *Id.*  Nonetheless, in *Spirits*, the appellant did "not contend that the specific context of the mark is such that an ordinary American purchaser sufficiently familiar with Russian would nonetheless take the mark at face value," *id.*, and both parties as well as the Court did "not dispute this general requirement of translation under the doctrine of foreign equivalents," *id.* at 1351.  Therefore, *Spirits* explained "[t]hat [translation] is not, however, the end of the inquiry" and proceeded to analyze the case as a question of "the scope of the materiality requirement" under subsection (e)(3) for geographic deceptive mis-descriptiveness.  *Id.* at 1352–57, 1357 n.5.

3.

Although this Court has noted "cases applying the doctrine of foreign equivalents somewhat differently in [different] contexts," *Spirits*, 563 F.3d at 1356 n.5 (collecting cases), that does not mean the doctrine is wholly different depending on context.  At oral argument, Appellant asserted that this Court has applied the doctrine of foreign equivalents "even-handedly" across the contexts of genericness or descriptiveness and likelihood of confusion.  Oral Arg. at 8:02–35.  Similarly, the PTO did not identify any differences between the doctrine of foreign equivalents in the contexts of genericness or descriptiveness and likelihood of confusion.  *Id.* at 20:59–21:45.  Our cases have elaborated on the doctrine of foreign equivalents mostly consistently by relying on overarching principles despite different contexts.  For example, *Spirits* noted the stop-and-translate analysis was a "threshold limitation on the application of the doctrine of foreign equivalents," block-quoting a portion of *Palm Bay*, which, in turn, cited *Northern Paper Mills*.  *Spirits*, 563 F.3d at 1351–52 (quoting *Palm Bay*, 396 F.3d at 1377); *see also Palm Bay*, 396 F.3d at 1377 (citing *N. Paper Mills*, 64 F.2d at 999); *see also, e.g., In re Magnesita Refractories Co.*, 716 F. App'x 978, 980 (Fed. Cir. 2017) (considering appeal relating to genericness

while relying on *Palm Bay*); 2 McCarthy on Trademarks and Unfair Competition § 12:41 & nn.8–9 (5th ed.) (explaining the doctrine of foreign equivalents in the genericness context by referencing legal standards for the ordinary American purchaser from *Palm Bay* and *Spirits*).

"Under the 'doctrine of foreign equivalents,' foreign words used as a mark are translated into English *and then tested* for descriptiveness, geographic descriptiveness and mis-descriptiveness, genericness, and" likelihood of confusion. 1 McCarthy on Trademarks and Unfair Competition § 11:34 (5th ed.) (emphasis added) (footnotes omitted); *see also* 2 McCarthy on Trademarks and Unfair Competition § 12:41 (5th ed.) (similar). The fact that *after* applying the doctrine of foreign equivalents, the analysis *then* differs depending on trademark context does not mean that the threshold doctrine of foreign equivalents analysis was applied differently.

At oral argument, the PTO stated that the primarily geographically deceptively misdescriptive analysis for Section 2(e)(3)—which has a proportionality requirement for materiality that a substantial portion of the intended audience be deceived—"is distinct from how the doctrine of foreign equivalents is presented." Oral Arg. at 18:32–19:16; *see also* 15 U.S.C. § 1052(e)(3). The materiality inquiry under Section 2(e)(3) is not the same inquiry as the threshold, doctrine of foreign equivalents, ordinary American purchaser, stop-and-translate inquiry. That does not mean the threshold ordinary American purchaser inquiry varies across trademark contexts. The discussion in *Spirits* of the targeted community's language skills and the percentage of the U.S. population that speaks Russian begins on or after page 1353 of 563 F.3d. None of these pages are cited by the parties in their briefing here. This portion of *Spirits* concerns the scope of the materiality requirement under subsection (e)(3)—not the threshold stop-and-translate analysis of the doctrine of foreign equivalents. 563 F.3d at 1357 n.5 ("In this case we address only subsection (e)(3)

and its materiality requirement."). *Compare id.* at 1351–52, *with id.* at 1353–57.

4.

This case, which is an appeal of a genericness or descriptiveness refusal, does not require us to delineate the precise boundaries of the doctrine of foreign equivalents in every context. The mixture of following and distinguishing precedent, based on the cases at bar, is appropriate for the doctrine of foreign equivalents, which "is not an absolute rule and should be viewed merely as a guideline." *Palm Bay*, 396 F.3d at 1377.

We now turn to the application of the doctrine of foreign equivalents to this case.

## DISCUSSION

On appeal, Appellant contends the Board's findings rely on an alleged "misapplication of the doctrine of foreign equivalents." Opening Br. 23. Appellant argues there is not substantial evidence to support the Board's findings that the proposed marks are generic or highly descriptive.

The PTO responds that the doctrine of foreign equivalents was properly applied by the Board. The PTO asserts that French is a common, modern language and one with which the ordinary American purchaser is familiar enough to recognize and translate the word for "clothing," especially when affixed to articles of clothing. The PTO argues that after translating VETEMENTS into the English word, "clothing," the marks are generic or alternatively merely descriptive as applied to the proposed classes involving articles of clothing and online retail store services for the same.

A.

We conclude that the Board properly considered the proposed marks under the doctrine of foreign equivalents.

1.

We begin by considering whether the ordinary American purchaser would stop and translate the mark into English because *Spirits* states that is "a threshold limitation on the application of the doctrine of foreign equivalents." *Spirits*, 563 F.3d at 1351 (citing *Palm Bay*, 396 F.3d at 1377).

2.

The Board's finding that the ordinary American purchaser would stop and translate the marks is consistent with our doctrine, and its underlying factual bases are supported by substantial evidence.

"[W]ords from modern languages are generally translated into English . . . ." *Palm Bay*, 396 F.3d at 1377. "[A] descriptive word, used in one of the modern languages of the principal nations of the world, cannot be properly registered as a trade-mark," *N. Paper Mills*, 64 F.2d at 999, and "[i]t is immaterial that the name is in a foreign language," *Weiss Noodle*, 290 F.2d at 847. We hold that unless it is unlikely that the ordinary American purchaser would stop and translate the word into its English equivalent, the doctrine of foreign equivalents applies. We view Appellant's opposition to translation, which purports to rely extensively on *Palm Bay*, as being unsupported by our caselaw. *Palm Bay* involved two circumstances that weighed against translation. 396 F.3d at 1377. This case presents neither such circumstance, so *Palm Bay* is not analogous. Appellant does not persuade us there is any other circumstance that would weigh against translation.[8]

---

[8] Besides the contexts mentioned here, there is one other that is not disputed. "[W]ords from dead or obscure languages are [not] to be literally translated into English

a.

First, when "an appreciable number of purchasers" are likely to be aware what the foreign word means in English, such circumstance weighs in favor of translation. *Palm Bay*, 396 F.3d at 1376–77 (citation omitted).

The parties dispute the relevant extent to which French is spoken and understood in the United States and the language capability of the ordinary American purchaser—in essence, *who* is the ordinary American purchaser. Appellant asserts that "an 'ordinary American purchaser' logically must mean something other than only American purchasers who speak the foreign language." Opening Br. 17. Appellant argues "only a minute fraction of Americans actually speak French." Opening Br. 15. This minute fraction means that in the relevant pool of purchasers in the general public, Appellant argues, there is a de minimis chance that the ordinary purchaser would either recognize the French word and know its English equivalent or "stop to hunt down the translation." Opening Br. 19–21. The PTO responds with U.S. Census Bureau data, also cited by the Board, demonstrating that as of 2010, approximately 2.1 million Americans over the age of five spoke a dialect of French at home. French is also the second most widely taught non-English language in schools in the United States. The PTO also disputes Appellant's conception of who is the ordinary American purchaser. Rather than considering the general public in its entirety, the PTO argues that the relevant purchaser is a consumer proficient in the foreign language.

---

for descriptive purposes." *Spirits*, 563 F.3d at 1351 (citation omitted). Appellant concedes it "does not argue that the French language is an obscure or dead language." Opening Br. 20.

It is evident that unlike in *Palm Bay*, here an "appreciable" number of Americans are capable of translating the term VETEMENTS from French into English. Substantial evidence in the record, on which the Board based its findings, demonstrates that, as of 2010, French (including all French dialects) was the fourth most common language spoken in the United States and 2.1 million Americans over the age of five spoke French at home. French was taught to "14% of all students enrolled in foreign languages" in elementary grades through high school, and "12.4%" of all American university foreign-language students. Appx341. Additionally, the word in question is a simple and common word—the word for clothing. On the other hand, "widow" requires a more advanced vocabulary. This, therefore, distinguishes this case from the aspect of *Palm Bay* that was premised on "an appreciable number of purchasers [being] unlikely to be aware that VEUVE means 'widow'" in French, and therefore "unlikely to translate the marks into English." *Palm Bay*, 396 F.3d at 1377 (emphasis omitted) (citation omitted).

Appellant disputes the Board's finding that the ordinary American purchaser would stop and translate the marks because Appellant argues there is no showing that a majority of Americans are capable of translating the word. Appellant's argument is based on parsing the words "ordinary" and "likely" from our cases to reflect "a statistical reference—meaning more than 50%" likelihood as to the overall population. Opening Br. 24–25. We reject Appellant's proposed test, which is tantamount to the threshold ordinary American purchaser under the doctrine of foreign equivalents requiring a headcount to determine the foreign language skills of the median American purchaser in every case.

Appellant cites no authority from this Court, its predecessor, or other Circuits that have required meeting a 50% population threshold understanding a word nor are we aware of any such authority. Indeed, our cases have held

"words from modern languages are generally translated into English." *Palm Bay*, 396 F.3d at 1377 (citing *N. Paper Mills*, 64 F.2d at 999). Our cases have translated and prohibited registration of a descriptive non-English mark regardless of "the idea which [the mark] may, or may not, convey to the general public." *N. Paper Mills*, 64 F.2d at 998 (citation omitted); *Weiss Noodle*, 290 F.2d at 847 (denying registration of a descriptive mark in Hungarian). Adopting Appellant's headcount rule would render the doctrine of foreign equivalents inapplicable for all words in non-English languages that are not understood by most Americans. The doctrine of foreign equivalents would be a nullity under Appellant's 50% rule.

It is enough to demonstrate that an "appreciable" number of Americans are capable of translating the term VETEMENTS from French into English. At this time, we do not need to precisely or rigidly define the ordinary American purchaser's language skills given the backdrop of well recognized principles in the doctrine of foreign equivalents that we have stated elsewhere in this opinion: "words from modern languages are generally translated into English," *Palm Bay*, 396 F.3d at 1377, typically "a descriptive word, used in one of the modern languages of the principal nations of the world, cannot be properly registered as a trade-mark," *N. Paper Mills*, 64 F.2d at 999, and usually "[i]t is immaterial that the name is in a foreign language," *Weiss Noodle*, 290 F.2d at 847.

Appellant objects to the Examining Attorney's conclusion in the Examining Attorney's brief to the Board that "the ordinary purchaser is one that is proficient in French." Appx423; Opening Br. 7, 12, 22. But the Board did not adopt the Examining Attorney's view. Rather, the Board found that "[c]onsumers familiar with French" would be likely to translate the marks because no evidence of record suggested "that 'vetements' is so obscure that it would not be easily recognized and translated." Appx15. The Examining Attorney's and Board's overall findings under the

doctrine of foreign equivalents are in accordance with law and supported by substantial evidence. Appellant also makes an unpersuasive argument that "[i]f an ordinary American purchaser is defined as including only American purchasers that speak the subject foreign language, then it seems there would never be a chance that the members of this select subset of purchasers would not translate the word in question." Reply Br. 3. Appellant's alarm is misplaced. We do not define the ordinary American purchaser rigidly, but even if the ordinary American purchaser was defined as a proficient speaker of the foreign language, that does not necessitate translation.[9] This Court has made

---

[9] We note that even to native speakers, not every word is known in their native language. We believe that is another reason to avoid a rigid definition of the language skills of the ordinary American purchaser. A rigid definition could necessitate an entirely separate inquiry into whether at least 50% of the native speakers of a given foreign language understand a certain word in their native language. For comparison, consider the English word "vestment." *Vestment*, Webster's Third New International Dictionary 2547 (2002) ("a liturgical garment"). It is derived from the same Latin word (*vestimentum*) as the French word, *vêtement. Compare id., with Vêtement*, Dictionnaire de l'Académie française, available at https://www.dictionnaire-academie.fr/article/A9V0629 [https://perma.cc/6Q59-526H]. Additionally, like the English word clothing, vestment is translated into French as *vêtement. Clothing*, Cassell's French Dictionary pt. 2, at 86 (1981); *Vestment*, Cassell's French Dictionary pt. 2, at 605 (1981). We do not need to determine how many English speakers know the meaning of the English word "vestment," nor does the doctrine of foreign equivalents require us to determine what percentage of foreign language speakers know the meaning of any given word in their native language.

clear that sometimes, a "literal translation would be irrelevant to even those ordinary American consumers who speak" the foreign language, for example, because of context. *Spirits*, 563 F.3d at 1352 (first citing *Palm Bay*, 396 F.3d at 1377; then citing *Cont'l Nut Co. v. Cordon Bleu*, 494 F.2d 1397, 1398 (C.C.P.A. 1974); and then citing *Tia Maria*, 188 U.S.P.Q. (BNA) at 525–26).

b.

Second, we consider if the context in which the words appear would cause the ordinary American purchaser to take the "VETEMENTS" marks at face value in French (i.e., not to translate). *See Palm Bay*, 396 F.3d at 1377.

Appellant argues that even if the Board correctly defined the ordinary American purchaser, she would not stop and translate the marks because of the specific context. Appellant argues that in this context, the marks "are displayed on fungible goods and in a manner that would readily be perceived as a trademark, rather than as describing the goods." Opening Br. 25. To support this claim, Appellant asserts its marks are "used in a trademark fashion, rather than in non-trademark prosaic textual context," "the trademark is the same as the trade name under which Appellant operates," and "there is no resemblance between the words 'vetements' and 'clothing.'" Opening Br. 26. The PTO disagrees. The PTO cites several media materials, also relied on by the Board, relating to Appellant, which note the direct English translation to clothing. Response Br. 17–18. The PTO further argues that because "vetements" is a direct translation of a common English word "clothing," that bears a direct relationship to the goods and services covered by Appellant's proposed marks, this is a situation where it is both feasible and likely that consumers would translate VETEMENTS. Response Br. 20–21.

Courts have held that "situations arise in the marketplace which make it unfeasible or even unlikely that

purchasers will translate the brand names or labels," *Tia Maria,* 188 U.S.P.Q. (BNA) at 525–26. In *Palm Bay,* the word VEUVE constituted part of a proposed mark for sparkling wine. 396 F.3d at 1370. The Court agreed with the Board's finding that even those familiar with French are unlikely to stop and translate the mark, VEUVE, into "widow" in English. *Id.* at 1377. *Palm Bay* and *Tia Maria* are distinguishable. *Palm Bay*, 396 F.3d at 1370, 1377; *Tia Maria,* 188 U.S.P.Q. (BNA) at 525–26. The word "widow" is not closely associated with wine, nor is "Aunt Mary" with food or restaurants. *Palm Bay*, 396 F.3d at 1370; *Tia Maria,* 188 U.S.P.Q. (BNA) at 525–26. Further, in *Tia Maria,* the consumer would be unlikely to translate the Spanish-language mark when encountering it upon dining at the applicant's "restaurant in Mexican decor and surrounded by a menu of Mexican delicacies." *Tia Maria,* 188 U.S.P.Q. (BNA) at 526.

Here, by contrast, the context is one in which taking the marks at face value (without translation) is unlikely because the context is clothing and the proposed marks mean clothing. The Board considered the context in which consumers would encounter the proposed VETEMENTS marks, namely "in an ornamental manner on [Appellant's] clothing and also in advertisements for its clothing and clothing-related services." Appx13. The Board reasonably found that an ordinary American purchaser would likely stop and translate the marks "when encountering [them] used in connection with [Appellant]'s identified clothing and clothing-related retail services." Appx15. We agree that "*vêtement*" is closely associated with clothing because it is the French word for clothing. For that reason, *Palm Bay* and *Tia Maria* do not persuade us that an ordinary American purchaser would not translate the French word for "clothing" in the context of clothing. *Palm Bay*, 396 F.3d at 1370, 1377; *Tia Maria,* 188 U.S.P.Q. (BNA) at 525–26.

3.

We next consider Appellant's contention that the marks should not be translated because they are arbitrary and fanciful. *See generally Real Foods*, 906 F.3d at 973 ("Terms that are suggestive, arbitrary, or fanciful are 'inherently distinctive' and therefore registrable." (citation omitted)). The PTO responds that Appellant forfeited this argument by failing to raise it with the Board. Even if not forfeited, Appellant's citation to *Menendez v. Holt*, 128 U.S. 514, 520 (1888), for the proposition that its marks, as well as any foreign-word marks, are fanciful, inherently registrable, and should not be translated, falls flat. *Menendez* concerned the foreign language phrase "La Favorita," which was "equivalent to the signature of [the trademark owner] to a certificate that the flour was the genuine article which had been determined by them to possess a certain degree of excellence." *Menendez*, 128 U.S. at 520. Appellant takes *Menendez* out of context to suggest that foreign language marks cannot have the foreign equivalents doctrine applied to them based on one part of one sentence in *Menendez* in which the Supreme Court said the mark did not "in itself, indicate quality, for it was merely a fancy name and in a foreign language." *Id.* Appellant's out-of-context quote is not *Menendez* elaborating on arbitrary and fanciful non-English marks. A more complete quote is:

> ["La Favorita"] did not, of course, in itself, indicate quality, for it was merely a fancy name and in a foreign language, but it evidenced, that the skill, knowledge and judgment of [the trademark owner] had been exercised in ascertaining that the particular flour so marked was possessed of a merit rendered definite by their examination and of a uniformity rendered certain by their selection. . . . And the fact that flour so marked acquired an extensive sale, because the public had discovered that it might be relied on as of a uniformly meritorious quality, demonstrates that the

> brand deserves protection rather than that it should be debarred therefrom, on the ground, as argued, of being indicative of quality only.

*Menendez*, 128 U.S. at 520–21. *Menendez* is inapposite to Appellant's arbitrary-and-fanciful-trademark argument.

Further, we need not opine on whether a foreign word can, on its face in the foreign language, be deemed arbitrary or fanciful. Here, substantial evidence supports the Board's finding that "vetement" has an easily recognizable direct translation and is not "an idiom which is not equivalent to its direct English translation." Appx9, 15.

4.

Finally, we consider if an ordinary American purchaser would not stop and translate the marks because, under Appellant's argument, it has "established substantial secondary meaning in the fashion industry" due to extensive sales and long use of the marks, Opening Br. 36, or as Appellant also asserts, the "appearance" and "design features" of its stylized mark are "instantly recognizable" and make "a unique commercial impression," Opening Br. 28–30; *see In re Vox Populi Registry Ltd.*, 25 F.4th 1348, 1353 (Fed. Cir. 2022) ("Design or stylization may make an otherwise unregistrable mark registrable if the features 'create an impression on the purchasers separate and apart from the impression made by the words themselves.'" (citation omitted)). The Board considered acquired distinctiveness and whether the stylized mark would make a separate commercial impression, and it held against Appellant based on substantial evidence. *See generally* 15 U.S.C. § 1052(f). Appellant does not challenge the underlying findings made by the Board, but instead asks this Court to reweigh evidence, which we decline to do because it is beyond the scope of our review on appeal.

5.

In sum, Appellant has not identified a sufficient reason that it would be unlikely that the ordinary American purchaser would stop and translate the word into its English equivalent.

Above, we distinguished *Palm Bay* based on two circumstances that weighed against translation in that case, but which are not present here. 396 F.3d at 1377; *see supra* Discussion A.2.a–b. Additionally, above, we discussed why two contentions Appellant makes against translation (arbitrary and fanciful, and secondary meaning) are unpersuasive. *See supra* Discussion A.3–4. We think it prudent to further distill the core principles relevant to analyzing the "threshold limitation on the application of the doctrine of foreign equivalents" of whether the ordinary American purchaser would stop and translate the mark into English. *Spirits*, 563 F.3d at 1351–52 (quoting *Palm Bay*, 396 F.3d at 1377). The guiding principles we identify here are nonexclusive and do not preclude the application of other principles where demanded by the particular circumstances of future cases.

First, the burden is on the party opposing translation to show that it is unlikely the ordinary American purchaser would stop and translate the word into its English equivalent. Placing the burden on a party opposing translation takes into account the well-recognized tenet that "words from modern languages are generally translated into English." *Palm Bay*, 396 F.3d at 1377; *see also Spirits*, 563 F.3d at 1351 (acknowledging the undisputed "general requirement of translation under the doctrine of foreign equivalents"); *N. Paper Mills*, 64 F.2d at 999; *Weiss Noodle*, 290 F.2d at 847.

Second, we consider the capability of the U.S. population to translate the word. *See supra* Discussion A.2.a. As long as an appreciable number of Americans, from the U.S. population as a whole, are capable of translating the word,

the word likely will be translated.  This principle does not require an absolute majority of the population being capable of translation because it takes into account that "words from modern languages are generally translated into English."  *Palm Bay*, 396 F.3d at 1377; *see also Spirits*, 563 F.3d at 1351; *N. Paper Mills*, 64 F.2d at 999; *Weiss Noodle*, 290 F.2d at 847; *cf. Palm Bay*, 396 F.3d at 1377 ("[A]n appreciable number of purchasers are unlikely to be aware that VEUVE means 'widow' . . . .  An appreciable number of U.S. consumers either will or will not translate VEUVE into 'widow' . . . ." (citation omitted)).

Third, we consider whether in context, the mark would ordinarily be translated by a purchaser (from the U.S. population as a whole) with *ordinary sensibilities*.  *See supra* Discussion A.2.b.  Because the second principle considers language capability, this third principle does not depend on linguistic capabilities.  Instead, it assumes linguistic ability but asks whether a purchaser with *ordinary sensibilities* would translate the word given the context in which the mark is used.  This follows from cases that have articulated sometimes even a native speaker would not perform a literal translation because it would be irrelevant in the context of the specific goods, services, or market.  *Spirits*, 563 F.3d at 1352; *Palm Bay*, 396 F.3d at 1377; *Tia Maria*, 188 U.S.P.Q. (BNA) at 525–26.

Here, under these principles, Appellant has not met its burden to show that the marks are unlikely to be translated, and thus, the doctrine of foreign equivalents applies.  The doctrine of foreign equivalents, once applied, requires the translation of "foreign words from common languages . . . into English to determine genericness [or] descriptiveness."  *Palm Bay*, 396 F.3d at 1377; 1 McCarthy on Trademarks and Unfair Competition § 11:34 (5th ed.) ("Under the 'doctrine of foreign equivalents,' foreign words used as a mark are translated into English and then tested for descriptiveness . . . [and] genericness . . . ." (footnotes omitted)).  Therefore, we next consider whether the marks,

translated from French as "clothing," are generic or descriptive.

### B.

The Board did not err in concluding that as translated under the doctrine of foreign equivalents, the VETEMENTS marks are unregistrable. The PTO argues that the Board's findings on genericness should be affirmed because the relevant public would understand the term "VETEMENTS," translated as "clothing" as a term that primarily refers to the genus of goods or services identified in Appellant's applications: namely, clothing items and online retail store services featuring clothing. Appellant argued to the Board that, even when translated, its marks are "inherently distinctive because the term 'clothing' does not describe the [Appellant's] goods and services." Appx16 (citation omitted). Instead, Appellant argued to the Board, it had applied for "specific items" rather than the general category of clothing. Appx16 (citation omitted). The Board was unpersuaded by this argument as Appellant did "not dispute that its goods are articles or pieces of clothing, or that its online retail store services feature articles or pieces of clothing." Appx16. Now on appeal, Appellant does not raise the argument about the specific goods and services for which it applied. More generally, Appellant only superficially disputes in this appeal that its marks are generic or descriptive if translated into "clothing" by merely alleging in a conclusory fashion a lack of substantial evidence.

A term is generic, and thus precluded from registration on the Principal Register, when the "relevant public primarily use[s] or understand[s] the term sought to be protected to refer to the genus of goods or services in question." *H. Marvin Ginn*, 782 F.2d at 989–90. Substantial evidence supports the Board's finding that, as translated to "clothing," the marks are generic. Each mark is the same word as the genus of products in which the proposed marks appear: that is, Appellant's "[s]hirts, skirts, sweaters, coats,

jackets, suits, caps, headwear, hats, hoods, visors, scarves, gloves, shoes, boots, waist belts, t-shirts, pants, blouses, dresses" in International Class 25 and "[o]nline retail store services for" the same in International Class 35. Appx51–58; Appx478–84; Appx1–3. Because it is generic, the word "clothing" is "incapable of indicating source." *Hotels.com*, 573 F.3d at 1302.

Because the marks are generic, we need not reach the Board's alternative holding that the marks are merely descriptive without acquired distinctiveness. Because a generic mark is "the ultimate in descriptiveness," it "cannot acquire distinctiveness." *Real Foods*, 906 F.3d at 972 & n.3 (quoting *Royal Crown*, 892 F.3d at 1366). Nonetheless, we note that we see no error in the Board's reasoning that the proposed VETEMENTS marks fall within the statutory bar of registration under Section 2(e) and (f) for merely descriptive words without acquired distinctiveness. 15 U.S.C. § 1052(e), (f). "The name of a thing is the ultimate in descriptiveness." *Weiss Noodle*, 290 F.2d at 847 (citation omitted).

Therefore, the Board did not err in concluding that the VETEMENTS marks are unregistrable.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive or unnecessary to reach. Accordingly, the Board affirming the Examining Attorney's refusal to register Appellant's marks is

## **AFFIRMED.**